

BC

FILED
4/3/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

ADEM ARSLANI,

Plaintiff,

v.

Case No. 26-CV-50118

LDJ/MFI

ABRIDGE AI, INC.,

PAUL RICCI,

Defendants.

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

**I.      INTRODUCTION**

1.      This action arises from Defendants' misappropriation, commercialization, and false attribution of Plaintiff Adem Arslani's proprietary healthcare informatics systems, including foundational architectures underlying modern ambient clinical documentation technologies.

2.      Defendant Abridge AI, Inc. ("Abridge") markets its platform as a novel, proprietary, and independently developed ambient clinical AI system designed to capture clinical conversations, process those interactions, and generate structured medical documentation integrated into electronic medical record systems ("EMRs").

3.     That representation is false or misleading.

4.     Years before Abridge's formation in or around 2018, Plaintiff conceived, developed, implemented, and reduced to practice systems capable of capturing clinical encounters, processing clinical speech inputs, and generating structured documentation integrated into EMR environments.

5.     These systems were not theoretical. They were deployed at enterprise scale across hospitals and multi-site physician practices, refined through continuous real-world clinical use, and supported by measurable outcomes including increased physician adoption, improved documentation efficiency, and substantial reductions in transcription costs.

6.     Plaintiff's work established core system architectures, including encounter capture, clinical speech processing, contextual workflow integration, and structured documentation generation pipelines, wherein audio inputs were captured and processed through structured workflows, including speech recognition and human-in-the-loop transcription, and converted into clinical documentation mapped into EMR fields. These systems were implemented using available technologies at the time and incorporated workflows designed to support subsequent automation of additional processing steps.

7.     Upon information and belief, Defendants' platform reflects these same core architectures, workflows, and methodologies.

8.     Defendants have represented their system as independently developed while omitting Plaintiff's prior conception, development, and implementation of substantially similar underlying system architectures.

**II.     JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Defend Trade Secrets Act, 18 U.S.C. § 1836) and 28 U.S.C. § 1332.

10. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper under 28 U.S.C. § 1391 because:

a. Plaintiff resides in this District; and

b. A substantial portion of the development, deployment, and disclosure of the systems at issue occurred in this District, including enterprise clinical implementations within Illinois.

## III. THE PARTIES

12. Plaintiff Adem Arslani is a citizen of Illinois, a United States Army Veteran, and a healthcare technology innovator with extensive experience in clinical informatics, enterprise system deployment, and speech-recognition-enabled clinical workflow optimization.

13. Defendant Abridge AI, Inc. ("Abridge") is, upon information and belief, a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania.

14. Defendant Paul Ricci is an individual residing in California. He served as Chief Executive Officer of Nuance Communications, Inc. ("Nuance") from 2000 through March 2018. Upon information and belief, Ricci is a Venture Partner at Lightspeed Venture Partners, which co-led Abridge's $150 million Series C funding round, and serves as a strategic advisor to Abridge.

## IV. FACTUAL ALLEGATIONS

**A.** **Plaintiff's Foundational Work and Reduction to Practice**

15. Plaintiff's work in clinical technology began in the mid-1990s, integrating audio and video communication into patient care. By 1999, he was leading telemedicine programs and developing early encounter-capture systems.

16. Between 2008 and 2012, while serving as Director of Information Systems and Informatics at Advocate Illinois Masonic Medical Center in Chicago, Plaintiff pioneered the enterprise-wide licensing model for Nuance's speech recognition technology, a model that became the foundation of Nuance's modern business strategy and is now used by approximately 77% of U.S. hospitals.

17. During this period, Plaintiff developed and deployed working systems that constitute prior art for ambient clinical documentation, including a "Transcribe Engine" that captured audio and video inputs, processed speech into clinical text outputs, and integrated those outputs into enterprise platforms, as well as electronic patient handoff systems that automated capture, routing, and structured documentation of clinical communications, including critical results workflows.

18. Plaintiff was repeatedly selected by Nuance to alpha and beta test its most critical products, including Dragon Medical Network Edition, Dragon Medical 360, and Dragon Medical One. These engagements gave Nuance personnel direct, repeated access to Plaintiff's proprietary implementations under confidentiality obligations.

19. In 2009, Nuance awarded Plaintiff its "Million Dollar Club" recognition for generating over $1 million in ROI, direct evidence of Defendant Ricci's knowledge of Plaintiff's value and innovations.

20. Between 2013 and 2018, Plaintiff led enterprise-scale speech recognition optimization at HealthQuest across four hospitals and more than 50 clinics.

His work resulted in a 400% increase in physician EMR satisfaction, an 81% reduction in transcription costs, and a 100% contract renewal rate for Nuance across at-risk clients. This work formed the basis of a 2018 study published by the American Medical Informatics Association (AMIA).

21.     During the HealthQuest engagement, Plaintiff disclosed his advanced concepts for ambient clinical documentation directly to Nuance research engineers and executives on-site, describing a system architecture and next-stage capabilities, including capturing entire clinical encounters, distinguishing participants within those encounters, processing the verbal exchange into clinically relevant components, and automatically generating structured documentation integrated into EMR systems. In late 2014, Plaintiff publicly documented these concepts in a published article, creating a time-stamped record of his invention.

22.     Plaintiff's unique methodology—[Identify Problem via Health Check] → [Customize Solution] → [Drive Adoption via Elbow Support] → [Transition to Managed Service], was not merely a business concept but an operational system incorporating defined diagnostic inputs, intervention protocols, user-behavior modification techniques, and longitudinal performance measurement processes, which together formed a repeatable and proprietary optimization framework that did not exist at Nuance and was later adopted as the operational backbone of its consulting services.

**B.      The HealthQuest Dataset**

23.     Plaintiff's work at HealthQuest generated a massive, unique, and proprietary dataset of physician usage data for Dragon Medical One, spanning four hospitals and over 40 medical clinics across numerous specialties.

24. This dataset was invaluable for training and refining large language models for ambient AI. Few, if any, comparable datasets existed at the time.

**C. Defendant Ricci's Access and the UPMC Connection**

25. Defendant Paul Ricci served as CEO of Nuance from 2000 to March 2018. During his tenure, Ricci attended Nuance Healthcare conferences at which Plaintiff presented his work. Between 2010 and 2018, Plaintiff met with Ricci in person at these conferences, and Ricci became familiar with Plaintiff's role in scaling enterprise speech recognition systems at Advocate Illinois Masonic Medical Center and HealthQuest, deployments that spanned multiple hospitals and more than 50 affiliated medical practices.

26. Between approximately 2010 and 2011, while Plaintiff was actively deploying his enterprise-wide speech recognition and clinical workflow systems under confidentiality conditions, Nuance (under Ricci's leadership) entered into a 10-year research and strategic engagement with the University of Pittsburgh Medical Center ("UPMC") to develop speech recognition and clinical language understanding technologies designed to capture, process, and utilize clinical interactions, creating a parallel institutional development pathway in the same technical domain in which Plaintiff's systems were being implemented and observed.

27. At the time of this agreement, Ricci publicly stated that the partnership would "change the face of healthcare delivery" and "accelerate the role healthcare IT plays in making clinical data more valuable."

28. Upon information and belief, Ricci had strong professional ties to UPMC, and those relationships continued after his departure from Nuance.

**D. Abridge's Founding at UPMC**

29.     Abridge was founded in 2018 by a practicing UPMC cardiologist and former executive of UPMC's innovation and venture capital arm. UPMC became an early investor and pilot site for Abridge, and Abridge has since been described as a "UPMC Enterprises portfolio company."

30.     Upon information and belief, the research, data, and technological frameworks developed through the Ricci-led Nuance-UPMC collaboration, which coincided temporally with Plaintiff's confidential deployments at Advocate, were incorporated into the institutional knowledge base that later gave rise to Abridge.

**E.      The Transfer of Plaintiff's Trade Secrets Through Reid Conant**

31.     In October 2018, the same month Abridge was founded, Reid Conant, a Nuance executive, incorporated Clinical AI Solutions, Inc. ("CAIS"). Eleven days later, Conant began aggressively recruiting Plaintiff with promises of 300,000 shares, a lucrative acquisition, and work on "AI-based technologies."

32.     Plaintiff joined CAIS in 2019, believing it was an independent company in which he would share ownership. In reality, CAIS was a vehicle through which Nuance could obtain Plaintiff's proprietary consulting frameworks.

33.     Within days of Plaintiff joining CAIS, Conant transmitted Plaintiff's HealthCheck program, Managed Services model, and Rapid Improvement Engagement (RIE) framework, including underlying operational structures, workflows, and implementation details, to Nuance executives Michael Clark and Brad Morrison, and acknowledged in writing that he would use the material "judiciously" in meetings at Nuance.

34.     Conant later told Plaintiff: "You are awesome and part of the CAIS SECRET INGREDIENT for sure," confirming that Plaintiff's methodologies were the source of CAIS's value.

35. Over approximately 18 months, Plaintiff's methodologies were deployed at over 40 healthcare organizations, generating millions in consulting revenue, achieving a 100% contract renewal rate for Nuance, and preserving hundreds of millions in annual recurring subscription revenue.

**F.      Abridge's Acquisition of Human Capital and Trade Secrets**

36. After CAIS was dissolved in 2021, Abridge hired Reid Conant as a Senior Physician Executive. Public records confirm that Conant currently holds this position and is described as having experience in "Ambient Clinical Intelligence," directly aligning with the systems and methodologies Plaintiff developed and reduced to practice years before Abridge's formation.

37. Conant acquired detailed knowledge of Plaintiff's proprietary systems and methodologies, including the HealthCheck program, the Managed Services model, the HealthQuest dataset, and the integrated system architecture, including workflow structures, deployment strategies, and optimization methodologies, during his role as CEO of CAIS.

38. By hiring Conant, Abridge obtained direct access to Plaintiff's trade secrets without authorization. Upon information and belief, Conant's knowledge of Plaintiff's methodologies was a factor in Abridge's decision to hire him.

**G.      Defendant Ricci's Strategic Role in Abridge**

39. Defendant Paul Ricci is not merely an investor in Abridge. Public records confirm that Ricci serves as an advisor to Lightspeed Venture Partners, which co-led Abridge's $150 million Series C funding round, and that Ricci is a strategic advocate for Abridge, and, upon information and belief, has actively supported, guided, and promoted Abridge's development, commercialization, and market positioning of ambient clinical documentation technologies.

40.     Ricci has publicly stated that Abridge is "ahead technologically" and "ahead in terms of deployment" compared to Nuance, the company he formerly led.

41.     Ricci has also publicly described Abridge's technology as enabling caregivers to "capture an enormous amount of data that is currently being discarded or ignored," a description that mirrors Plaintiff's foundational work in capturing clinical conversations and transforming them into structured documentation.

## H.     Abridge's Awareness and Blacklisting of Plaintiff

42.     In 2024 and 2025, Plaintiff applied for over ten positions at Abridge aligned with his expertise, including the Clinical Success Director position, for which he received a formal rejection on or about May 16, 2025. A true and correct copy of that rejection email is attached as Exhibit A.

43.     These roles involved responsibilities substantially similar to the systems and methodologies Plaintiff had previously developed. Despite his unparalleled qualifications, Plaintiff was systematically denied any interview or meaningful consideration.

44.     Upon information and belief, Plaintiff's blacklisting by Abridge was intended to conceal the origins of its platform. Hiring Plaintiff would threaten to expose the misappropriated trade secrets and the role of Ricci and Conant in their transfer.

## I.     Structural Similarity and Misappropriation

45.     Abridge's platform performs functions substantially similar to Plaintiff's systems, including capturing clinical conversations, processing speech inputs, generating structured clinical documentation, and integrating outputs into EMR systems, utilizing a comparable end-to-end workflow architecture consisting of input capture, speech processing, contextual interpretation, and structured output generation.

46.     The similarity reflects a shared underlying workflow architecture, capture, processing, contextualization, and structured output, previously developed and implemented by Plaintiff in enterprise clinical environments.

47.     Plaintiff's prior development, combined with Defendants' knowledge pathways, including Ricci's access, the Nuance-UPMC relationship, the HealthQuest dataset, and Conant's acquisition and transfer of Plaintiff's methodologies, supports a plausible and reasonable inference that Defendants used systems derived from Plaintiff's work.

**J.      Retaliatory Conduct and Concealment**

48.     On November 20, 2025, Plaintiff filed a complaint with the U.S. Department of Labor Veterans' Employment and Training Service (VETS-1010) alleging retaliation based on his veteran status.

49.     Nineteen days later, on December 9, 2025, Conant, by then a senior executive at Abridge, filed a lawsuit against Plaintiff in California Superior Court. On February 25, 2026, Plaintiff filed an anti-SLAPP motion to dismiss that lawsuit.

50.     On March 11, 2026, the U.S. Department of Labor transferred Plaintiff's VETS-1010 complaint to the U.S. Department of Justice for consideration of representation. A true and correct copy of the transfer notification is attached as Exhibit B.

51.     The timing of Conant's lawsuit, filed 19 days after Plaintiff's VETS complaint and while Conant was employed by Abridge, demonstrates a pattern of retaliation and an effort to conceal the misappropriation. Abridge has not disclaimed or repudiated Conant's conduct.

**K.      Harm and Tolling**

52.     Plaintiff has suffered economic harm, loss of opportunity, and misattribution of his work.

53. Plaintiff did not discover, and could not reasonably have discovered, Defendants' misappropriation until approximately September 2025. The systems at issue involve back-end architectures not visible through public interfaces.

54. Plaintiff was further impeded by Defendants' fraudulent concealment, including Ricci's concealed role, the dissolution of CAIS, and the unresolved conflict-of-interest complaint Plaintiff filed with Nuance on September 8, 2021, which was acknowledged but never investigated.

## V. CAUSES OF ACTION

**COUNT I – TRADE SECRET MISAPPROPRIATION**

(Defend Trade Secrets Act, 18 U.S.C. § 1836)

55. Plaintiff realleges and incorporates by reference paragraphs 1 through 54.

56. Plaintiff's systems, methodologies, and related data, including the HealthCheck program, the Managed Services model, the HealthQuest dataset, and the integrated system architecture, constitute "trade secrets" under 18 U.S.C. § 1839(3) in that they consist of specific, non-public combinations of processes, system designs, workflow architectures, implementation methodologies, and performance optimization techniques that derive independent economic value from not being generally known and not being readily ascertainable by proper means, and for which Plaintiff took reasonable measures to maintain secrecy.

57. Defendants misappropriated these trade secrets by improper means, including through Ricci's access and subsequent affiliation with Abridge, the incorporation and use of operational knowledge and data derived from Plaintiff's systems, and the hiring of Conant, who possessed detailed knowledge of Plaintiff's trade secrets and conveyed that knowledge within Abridge.

58. Defendants' conduct was willful and malicious, entitling Plaintiff to exemplary damages and attorney's fees under 18 U.S.C. § 1836(b)(3).

## COUNT II – UNJUST ENRICHMENT

(Alternative)

59. Plaintiff realleges and incorporates by reference paragraphs 1 through 58.

60. Defendants have benefited from Plaintiff's systems, methodologies, and trade secrets without authorization.

61. Retention of those benefits without compensation is unjust. If the Court determines that this claim is preempted by the Defend Trade Secrets Act, Plaintiff asserts it in the alternative.

## COUNT III – DECLARATORY JUDGMENT

(28 U.S.C. § 2201)

62. Plaintiff realleges and incorporates by reference paragraphs 1 through 61.

63. An actual controversy exists regarding the origin of the system architecture underlying ambient clinical documentation technologies.

64. Plaintiff seeks a declaration that he is the original conceiver and developer of the system architectures at issue, including the foundational methodologies and workflows that form the basis of Abridge's platform.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

A. A declaratory judgment that Plaintiff is the original conceiver and developer of the system architectures at issue;

B. Compensatory damages in an amount to be proven at trial;

C.      Exemplary and punitive damages for willful and malicious misappropriation;

D.      Disgorgement of Defendants' profits attributable to the misappropriation;

E.      Injunctive relief prohibiting Defendants from further use or disclosure of Plaintiff's trade secrets;

F.      Costs of suit and reasonable attorney's fees; and

G.      Such other relief as the Court deems just and proper.

## VII.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 3, 2026

/s/ Adem Arslani

Adem Arslani, Pro Se

6523 Midleton Lane

McHenry, IL 60050

(847) 767-9098

arslani.adem@gmail.com

## EXHIBIT LIST

- Exhibit A – May 16, 2025, rejection email from Abridge AI, Inc. regarding Plaintiff's application for Clinical Success Director position

- Exhibit B – March 11, 2026 U.S. Department of Labor transfer notification (VETS-1010 Case No. MA-2026-00006-10-V)

**VERIFICATION**

I, Adem Arslani, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I am the Plaintiff in the foregoing action and that I have read the foregoing Complaint and know the contents thereof. The factual allegations contained in the Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on this 3rd day of April, 2026.

/s/ Adem Arslani

Adem Arslani

# EXHIBIT A

May 16, 2025 Rejection Email from Abridge AI, Inc.
Regarding Plaintiff's Application for Clinical Success Director Position

## Adem - Update from Abridge ➤ Inbox ✕



**Abridge Hiring Team** <no-reply@ashbyhq.com>

to me ▾

May 16, 2025, 9:35 AM

Hi Adem,

Thanks for your interest in the Clinical Success Director (ET/CT) role at Abridge. The applicant pool for this role is quite competitive, and we've decided not to proceed at this time.

That said, we'd like to keep your resume on file for future roles as we grow. Please continue to check our careers site and LinkedIn page for updates.

All the best in your search.

Thanks again,
The Abridge Team



# EXHIBIT B

March 11, 2026, U.S. Department of Labor Transfer Notification
(VETS-1010 Case No. MA-2026-00006-10-V)

# Transfer of Case Number MA-2026-00006-10-V to DOJ

**VCMS Administration** noreply@appiancloud.com <u>via</u> cmp.dol.gov

2:05 PM (4 hours ago)

to me, collins.christopher.m, Klein.Rebecca.M, laterza.anthony, white.james.j, evans.jason, wardlaw.marcus.k, bailey.rachel, thimodo.stephanie, richardson.thomas, alicea.anthony, potter.steven ▾

Adem Arslani:

Case number MA-2026-00006-10-V has been transferred by the Department of Labor to the Department of Justice (DOJ). Your case file will now be reviewed by DOJ for consideration of representation. If you have any questions or concerns, or if your claim is settled or resolved during this phase, please contact DOJ directly.

Nicole Siegel
Director, Servicemembers and Veterans initiative
U.S. Department of Justice, Civil Rights Division
4 Constitution Square
150 M St. NE
Washington, DC 20530
servicemembers@usdoj.gov